RECORD NO. 11-4631

In The
# United States Court of Appeals
### For The Fourth Circuit

**UNITED STATES OF AMERICA,**

*Plaintiff – Appellee*,

v.

**RYAN HOLNESS,**

*Defendant – Appellant*.

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND AT BALTIMORE**

―――――――

**REPLY BRIEF OF APPELLANT**

―――――――

Jonathan A. Gladstone
LAW OFFICE OF JONATHAN GLADSTONE
113 Ridgely Avenue
Annapolis, Maryland 21401
(410) 974-6903

*Counsel for Appellant*

THE LEX GROUP ♦ 1108 East Main Street ♦ Suite 1400 ♦ Richmond, VA 23219
(804) 644-4419 ♦ (800) 856-4419 ♦ Fax: (804) 644-3660 ♦ www.thelexgroup.com

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

McNeil v. Wisconsin,
    501 U.S. 171 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

United States v. Alvarado,
    440 F.3d 191 (4th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 7

United States v. Coker,
    433 F.3d 39 (1st Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

United States v. Mills,
    412 F.3d 325 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

United States v. Mohamadi,
    No. 1:09–cr–00179 (E.D. Va. Mar. 2, 2010) . . . . . . . . . . . . . . . . . . . . . 5

United States v. Mohamadi,
    10-4704, 2012 WL 104926 (4th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . 5

**CONSTITUTIONAL PROVISIONS**

U.S. CONST. amend. V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

U.S. CONST. amend. VI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 3

Appellee's central argument is that the state, in conducting its investigation, can intentionally and flagrantly violate a defendants's Sixth Amendment rights, and then hand the case over to federal prosecutors who would then get to use evidence that never would have seen the light of day had there been a state prosecution.

The record here does not reveal why the state handed the case off to the federal government. Was it undertaken in an effort to take advantage of this crucial, albeit illegal, evidence without which the prosecution would have foundered? We don't know.

From the prosecution's standpoint, the "silver platter" doctrine operates in full force. Maybe it never went away. What the prosecution wants this court to do is to endorse an approach in which a state case tainted by a state Sixth Amendment violation can be handed to the federal government and have the taint miraculously removed. Or visa versa. This "tarnished silver platter" doctrine has no place here.

Here we have a situation in which the case was completely investigated by the State of Maryland. Any mistakes made by anyone were made by Maryland officials in pursuit of their case. The evidence adduced at the pre-trial hearing did not indicate any federal involvement at that point.

The record is barren as to when the first state-federal contact took place in this case. The only evidence on that point came from Sgt. Hall's testimony at the

pretrial motion hearing, when he indicated that he did not contact federal authorities before the events at issue (JA 71-72) However, we wouldn't expect Sgt. Hall to make the initial contact with federal authorities, at any rate. After the investigation was complete, state officials wrapped it in a bow (or put it on a silver platter) and turned it over to the federal prosecutors.

Claiming that the dual sovereign doctrine protects the information gathered by McGrath, the government relies on authorities which have no applicability in the current case. The government cited <u>McNeil v. Wisconsin</u>, 501 U.S. 171 (1991) to support its proposition. "The Sixth Amendment functions to "protect the unaided layman at critical confrontations with his expert adversary, the government, after the adverse positions of government and defendant have solidified with respect to a particular alleged crime." <u>McNeil v. Wisconsin</u>, 501 U.S. at 175 (Appellee's brief at 39) But isn't that the situation in the instant case. Appellant was in state custody facing state charges for which he had an attorney being investigated by the state police who sent an informant in to gain information.

In <u>United States v. Alvarado</u>, 440 F.3d 191 (4th Cir. 2006), this court found it acceptable when federal authorities questioned a defendant regarding federal charges after his state case, in which he had representation, was dismissed. This is completely different from the situation in the instant case. In <u>Alvarado</u>, the court

2

indicated it was joining other circuits which reached a similar conclusion. One case so cited was United States v. Coker, 433 F.3d 39, 44-45 (1st Cir. 2005). In that case, the court noted that a dual sovereignty claim cannot be used to conduct and end run around the Sixth Amendment, and that if the idea of two independent prosecutions was a "sham." In this case, the sham is that the federal government did anything at all to investigate the case. This is the situation the Second Circuit sought to avoid in United States v. Mills, 412 F.3d 325, 330 (2d Cir. 2005). "Where, as here, the same conduct supports a federal or a state prosecution, a dual sovereignty exception would permit one sovereign to question a defendant whose right to counsel had attached, to do so in the absence of counsel and then to share the information with the other sovereign without fear of suppression. We easily conclude that Cobb was intended to prevent such a result." Id. at 330. It should be noted that many of the "dual sovereignty" cases arise in the context of double jeopardy claims, where the issues are similar but not identical.

The prosecution also presents a Catch-22 in its analysis, that in order for the Sixth Amendment to apply across federal and state prosecutions, the crimes have to be identical; but at the same time, the government claims that it is impossible that they be identical.

While the government's primary argument is that it could use McGrath's testimony no matter what Sixth Amendment violations the state authorities

3

committed, a backup argument was that the police officer's conduct was perfectly fine.

The prosecution continues to promote the fiction put forward at the trial level that the state police sergeant instructed the informant not to ask any questions. In its brief, the government continues to quote Sgt. Hall's testimony at the hearing that "I told [McGrath] that I wanted information, but I told him...that he can't ask him any questions." (Appellee's brief 31) This belies the fact that he never said that to McGrath as was revealed in the recording. **He never told McGrath not to ask questions about the case.** Instead, he offered carefully couched statements designed to induce McGrath to pursue the investigation. When Sgt. Hall says, for example, "So what I'm saying is I would like to hear what he has to say, but I can't tell you to go in there... I can't tell him, tell you to do that. But anything that you might find out through speaking with him, you can let me know. I'll give you my card.," he is clearly saying he wants McGrath to continue his investigation but he (Sgt. McGrath) just can't instruct him to do so. Over and over again, he made it clear that he wanted the information, but he can't order his agent directly. There is no ban on questions and no ban on further discussion of the charged crime for which Sgt. Hall was the investigating officer and for which Appellant had counsel.

4

As Appellant's attorney noted during the pre-trial motion hearing, it seems clear that Sgt. Hall was telling McGrath, with a "wink and a nod" (JA at 92) that he wanted McGrath to pursue information on the pending murder case for which Appellant was jailed and had representation.

The utter inadequacy of Sgt. Hall's admonishment is made even clearer when contrasted with a situation in which investigating officers took some pains to make sure that their jailhouse informant did not go to far.

Compare Sgt. Hall's "I can't tell him, tell you to do that. But anything that you might find out through speaking with him, you can let me know." with the advisement noted by the trial court in its hearing in United States v. Mohamadi, 10-4704, 2012 WL 104926 (4th Cir. 2012), decided by this court earlier this year. "Inmate 3 was given explicit instructions not only to have no further conversation with Defendant about the underlying offense, but also that if Defendant volunteered any information about the underlying robbery not to repeat it to law enforcement." United States v. Mohamadi, No. 1:09–cr–00179 (E.D. Va. March 2, 2010).

What followed the initial conversation between Sgt. Hall and McGrath reinforced Sgt. Hall's explicitly expressed interest in having McGrath continue as an evidence-gatherer. Certainly in Sgt. Hall's testimony at the pre-trial motion hearing, Sgt. Hall acknowledged that the conversations that McGrath recorded

5

with the recorder Sgt. Hall gave him showed that McGrath engaged in extensive questioning about the charged case. (JA at 93-94) It was clear the McGrath got the message that the government was encouraging his investigative efforts.

The government also claims that McGrath's efforts as a government agent were justified in that he was investigating a new crime, i.e. the so-called confession letter. The record shows no such thing. According to Sgt. Hall's testimony, he received a phone call from McGrath and then provided him with a recorder after McGrath told Hall in a phone call "that Mr. Holness was writing a confession letter that he wanted him to send to various media outlets, newpapers, etc." (JA 70-71) Unless it is illegal to confess to a crime, what is the new crime here? There is no indication that McGrath said a <u>false</u> confession was in the works. And, of course, what did not become clear until McGrath actually testified was that he himself wrote the first draft of that letter.

It is clear that the letter itself was partly a product of McGrath's efforts, considering his role as the writer of the first draft. But for McGrath's activities on behalf of the government, there is no way to know that the letter would have existed at all.

Appellant rejects the Government's argument that McGrath's activities, even if they were the acts of a government agent, should not be viewed as an interrogation and should not be accorded any protections which would accrue in

6

that situation. As noted in the opening brief, the circumstances in the instant case were much more dangerous to Appellant because he was not on notice that he was being interrogated by a government agent and not given notice of his Fifth Amendment rights. The <u>Alvarado</u> court went out of its way to note that Alvarado was provided his Miranda warnings before questioning began.

Appellant maintains that the letter that McGrath purloined after being directed to throw it away should not have been admitted and was certainly "fruit of the poisonous tree."

For the reasons cited above, Appellant renews his request that the court overturn his conviction and remand with appropriate instructions.

                              Respectfully Submitted,

                              <u>/s/ Jonathan A. Gladstone</u>
                              Jonathan A. Gladstone
                              Law Office of Jonathan Gladstone
                              113 Ridgely Avenue
                              Annapolis, Maryland  21401
                              (410) 974-6903

                              *Counsel for Appellant*

# CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

    [ X ] this brief contains [*1,612*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

    [  ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    [ X ] this brief has been prepared in a proportionally spaced typeface using [*Corel WordPerfect 12*] in [*14pt Times New Roman*]; *or*

    [  ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].


Dated: April 6, 2012                          /s/ Jonathan A. Gladstone
                                              *Counsel for Appellant*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 6th day of April, 2012, I caused this Reply Brief of Appellant to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

> John F. Purcell, Jr.
> Office of the U.S. Attorney
> 36 South Charles Street, 4th Floor
> Baltimore, Maryland  21201
> (410) 209-4800
>
> *Counsel for Appellee*

I also certify that on this 6th day of April, 2012, I caused the required number of bound copies of this Reply Brief of Appellant to be hand-filed with the Clerk of this Court.

/s/ Jonathan A. Gladstone
*Counsel for Appellant*